CHRISTOPHER E. CHANEY (SBN 328679)
Law Office of Christopher Chaney
14401 Sylvan St., Suite 229
Van Nuys, California 91401
Telephone (818) 538-8891
Email: chris@ceclaw.net

Attorney for Defendant
TIMOTHY INGRAM

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:21CR02216-003-CAB |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S POSITION RE: SENTENCING, WITH EXHIBITS** |
| | ) | |
| v. | ) | |
| | ) | |
| TIMOTHY INGRAM, | ) | Sentencing Date: August 31, 2022 |
| | ) | Time: 10:00 a.m. |
| Defendant. | ) | Court: Hon. Cathy Ann Bencivengo |
| | ) | |
| | ) | |
| | ) | |

Defendant TIMOTHY INGRAM, through counsel, hereby submits his Position Regarding Sentencing, with Exhibits.

Defendant reserves the opportunity to make additional comments through counsel at the sentencing hearing in this matter.

Date: August 24, 2022          Respectfully submitted:

LAW OFFICE OF
CHRISTOPHER CHANEY

By      */s/Christopher Chaney*
CHRISTOPHER CHANEY
Attorney for Defendant
TIMOTHY INGRAM

1

# I.

## OVERVIEW AND RECOMMENDED SENTENCE

Defendant Timothy Ingram, age 30, has pleaded guilty to one count of Conspiracy to Conduct Enterprise Affairs Through a Pattern of Racketeering Activity, in violation of 18 U.S.C. §1962(d).

In the Plea Agreement, the parties stipulated to a base offense level of 7 [U.S.S.G. §§2E1.1 (a)(2), 2B1.1(a)(1)]; a 16-level increase for loss amount [U.S.S.G. §2B1.1(b)(1)(I)]; a 2-level increase for number of victims and mass marketing [U.S.S.G. §2B1.1(b)(2)(A)(i) & (ii)]; a 2-level increase for vulnerable victim [U.S.S.G. §3A1.1(b)(1)]; a 2-level increase for large number of vulnerable victims [U.S.S.G §3A1.1(b)(2)]; and a 4-level increase for role in the offense [U.S.S.G. §3B1.1(a)]. With a 3-level adjustment for timely acceptance of responsibility [U.S.S.G. §3E1.1(a) & (b)] the total offense level is 30.[1] At Criminal History Category II this produces an advisory guideline range of 108 to 135 months.[2] However, the parties do stipulate that the defendant is free to seek a sentence outside

---

[1] Mr. Ingram, through counsel, believes that the application of three separate but overlapping 2-level increases for the number and nature of the victims -- one because the victims are vulnerable, another for simple number of victims, and yet another for number of vulnerable victims -- could reasonably be construed as "double-counting" that produces an unwarranted mechanical inflation of his advisory guidelines. Subtracting two levels to correct this calculation would yield a total offense level of 28.

[2] The Presentence report originally disclosed on 6/23/22 contained no mention of the December 13, 2015 arrest for simple marijuana possession in Mecklenburg County, North Carolina, which is the basis for placing Mr. Ingram in Criminal History Category II. It was then raised in the Addendum to the PSR on 6/24/22, and was assigned one criminal history point, leaving Mr. Ingram in Criminal History Category I. A month later, on 7/21/22, a 2nd Addendum to the PSR was disclosed which arrived at the conclusion that the 2015 marijuana possession arrest should generate 3 criminal history points and shift the defendant to Category II, even though it was a deferred prosecution. It is noted that in California possession of marijuana is not a crime and this case would not affect the defendant's criminal history category. For this reason, and as will be discussed in a subsequent section, it would be inappropriate to increase the length of Mr. Ingram's imprisonment over this minor and deferred prior marijuana case.

of the advisory guidelines, pursuant to 18 U.S.C §3553(a) [Plea Agreement, Pages 9-10].

The PSR recommends a sentence at the low end of the advisory range, and notes:

> The defendant has minimal past law enforcement contacts and no documented criminal convictions…. INGRAM voiced the support of his parents, specifically that of his mother. As confirmed by the defendant's mother, Ms. Hill, INGRAM will indeed have the support of his family, the majority of whom reside in the eastern portion of the country.[3]

Timothy Ingram recognizes that his illegal conduct was reprehensible and understands that he must be held accountable for his offense. He is ashamed of what he did, especially when he thinks of his own grandparents and how he would feel if they had been similarly victimized. He was using marijuana and other substances heavily at the time, and while certainly not an excuse, there seems little question that his drug dependency affected his behavior, judgment, and values.

It is submitted that when the "history and characteristics" of this young and still maturing defendant are taken into full account, a sentence of 60 months imprisonment, followed by a period of Supervised Release with suitable punitive, rehabilitative, and restorative terms and conditions would be appropriate. Mr. Ingram has never before served even a brief term of custody, and the year of incarceration he has experienced so far has made an indelible impression on him.

A detailed release plan is included below to reassure the Court that Mr. Ingram will have adequate support to help him satisfy all of the conditions imposed, and to help him remain drug-free following his release.

---

[3] PSR, ¶¶ 42-51, 107-108 and 114 and 2nd Addendum to the PSR, filed on 7/21/2022.

3

## II.

## ACCEPTANCE OF RESPONSIBILITY

Timothy Ingram has expressed remorse for having broken the law and he is full of regret that he has put his family, especially his mother, through the ordeal of his arrest and prosecution. Timothy has been in custody for one year and has taken this opportunity to reflect on his actions. In his letter to the Court, dictated by telephone from GEO Service Processing Center in El Centro, he states:

> Judge Bencivengo, thank you for letting me express my feelings and apologize to the families and the victims that were hurt by my wrong behavior.

> I have accepted responsibility for the charges and the role that I played. I love my grandparents with all my heart and want to make sure they are okay at all times. When I think of the victims I hurt and I think that the same thing could happen to my grandparents, I feel so terrible and painful. I was raised in the church with my mother and grandmother. They taught me how to be a gentleman and do right by people. I would be angry if my grandmother or grandad was a victim. So I think I understand what the families feel.

> As I have been sitting in jail for this past year I have realized a lot about myself and the mistakes I have made. It has helped me become a better person. I have not seen my mother but a few times in the past year because she lives so far away. I am truly sorry to her for putting her through this stress from me being here. To the victims and

4

their families I am extremely sorry for what you had to go through and the impact that it made.  I have thought about everything as I've been incarcerated and I've really been beating myself up about it.

Your honor this is your first and last time seeing me in a courtroom as I have cleaned up my act and I am ready to make things right as best I can.  Thank you again for letting me express my feelings.

## III.

## COMMENTS ON THE ADVISORY GUIDELINES

A.    *Overrepresentation of Criminal History*

On July 21, 2022 the Probation Officer filed a 2nd Addendum that recalculated the defendant's criminal history category from I to II, and increased their sentencing recommendation from 97 to 108 months:

However, the advisory Guidelines specifically provide that a sentencing court may depart downward if the applicable criminal history category "substantially over-represents the seriousness of a defendant's criminal history or the likelihood that a defendant will commit other crimes…" U.S.S.G. §4A1.3.  See also United States v. Flores-Uribe, 106 F.3d 1485, 1487 (9th Cir. 1997) (implicitly recognizing District Court's authority to make a horizontal departure); United States v. Brown, 985 F.2d 478, 481-82 (9th Cir. 1993) (recognizing power to depart downward to correct for criminal history score that overstates the seriousness of criminal history, quoting U.S.S.G. §4A1.3).

In determining whether a defendant's criminal history is overrepresented, courts may consider the following factors: (1) the age of the prior convictions; (2) the defendant's age at the time of the priors; (3) whether drug and alcohol use were involved in the priors; (4) the circumstances of the prior offenses; (5) the length of

the prior sentences; (6) the circumstances of the defendant's life at the time of the priors; and (7) the proximity of the priors. See United States v. Hammond, 240 F.Supp.2d 872, 877-80 (E.D. Wisc. 2003).

Here, Mr. Ingram's criminal history is tied in no small part to his struggles with addiction. Given that his prior personal marijuana conviction from 2015 was deferred and that it was part and parcel of his problems with substance abuse, a departure in this case is warranted. Placement in Criminal History Category II would overrepresent his criminal history, and the Court is respectfully asked to depart downward, or laterally, to Category I.

The fact that Mr. Ingram had a very minor prior conviction which was originally believed by the Probation Officer not to be countable, though subsequently included, should not be the basis for elevating his prison sentence by 11 months as the Addendum to the PSR seems to recommend. Mr. Ingram has been very open and candid with all parties, including U.S. Probation, about the nature and extent of his marijuana problem. It would make no sense to elevate his term by nearly a year on this ground. It would do nothing additional to protect the public or to assist Mr. Ingram on his personal journey to rehabilitation, nor would it help to conserve limited resources. And, as noted, it seems overly random to increase the criminal history category over a violation in North Carolina that would not have generated points had it occurred in California.

B.      *Additional Factors for Consideration*

There is a well-established consensus that the advisory Guidelines for economic loss can be seriously flawed. Unlike most Sentencing Commission Guideline policy decisions, these particular Guidelines did not result from the painstaking, empirical analysis which was the hallmark of the Commission's original studied approach to developing sentencing guidelines. Rather, the economic loss Guidelines are primarily the product of the Sentencing Commission's non-empirical acquiescence to political pressure.

In a recent article in the Ohio State Journal of Criminal Law authors Barry Boss and Kara Kapp argue that sentencing recommendations based solely on the economic crimes sentencing guidelines are arbitrary and disproportionate. From an extensive review of the history of the advisory guidelines, Boss and Kapp find that this has been the case since virtually the beginning and the result has been unwarranted sentencing disparities among similarly situated offenders based purely on the jurisdiction in which a defendant is tried. The authors note that as far back as the 1980s, the Sentencing Commission "deviated from its standard practice of anchoring the recommended sentencing ranges in the empirical data" and that "Section 2B1.1's loss enhancement is entirely untethered from its empirical roots, fails to effectively address the policy concerns animating this deviation from prior judicial practice, and has lost the confidence of a great many jurists."

Drilling down further, Boss and Kapp find that judges depart or vary below the Guidelines in the majority of cases in which the §2B1.1 loss enhancement applies:

> The downward variances given to such offenders, moreover, are typically significant. The mean sentences imposed on fraud offenders in 2018 and 2019 were 21 and 20 months respectively, more than 50 percent below the low end of the Guideline range. Likewise, the median sentences imposed on fraud offenders in 2015 through 2019 were 12, 15, and 16 months, 45 to 50 percent below the low end of the Guideline range.

In 1989, the loss table was recalibrated to increase enhancements based on loss amount [Amendment No. 154 (Nov. 1, 1989), U.S.S.G. §2F1.1]. "This increase was not in response to a congressional directive, nor was it based on empirical evidence or national experience."[4] When what became a series of increases was first

---

[4]https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/table-of-amendments-to-fraud-guidelines-ussg-2b1-1-and-2f1-1-1988-2013.pdf.

implemented it was at increments of one level for loss amounts up to $350,000. By 2001 [Amendment. No. 617 (Nov. 1, 2001), U.S.S.G. §2B1.1] the same loss amount triggered an increase of four levels. This obviously resulted in defendants sentenced under §2B1.1 receiving far longer sentences. Once again, however, the impetus for the increase did not come from the sentencing commission findings, but from politicians seeking to curry favor with the public through "get tough on crime" legislation.

Another data platform that judges increasingly consult at sentencing is the new Judiciary Sentencing Information (JSIN) platform, which provides data on national sentences in the last five years for defendants with the same primary guideline, final offense level, and criminal history category. In the case at bar JSIN shows a 70-month average sentence for defendants who are similarly situated to Mr. Ingram.[5]

In sum, it is clear that sentencing judges are increasingly opting not to rely solely on the Guidelines under §2B1.1 to determine the proper means and length of punishment for fraud cases. Instead, judges have implemented sentences based on a careful appraisal of the totality of factors with particular emphasis on the 18 U.S.C. §3553(a) factors.

Under the principles set forth in United States v. Booker, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are now, of course, purely advisory. The Guidelines are one among a number of factors that sentencing courts are directed to assess in imposing a sentencing that is "sufficient, but not greater than necessary" to

---

[5] During the last five fiscal years (FY2017-2021), there were 143 offenders whose primary guideline was §2B1.1, with a Final Offense Level of 30 and a Criminal History Category of I, after excluding offenders who received a §5K1.1 substantial assistance departure. For the 142 offenders (99%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 70 month(s) and the median length of imprisonment imposed was 72 month(s).
https://jsin.ussc.gov/analytics/saw.dll?Dashboard&PortalPath=%2Fshared%2FJSIN%2F_portal%2FJSIN&page=Sentencing%20Table.

achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2). Neither §3553(a) nor Booker suggests that any of these factors is individually paramount. All of them, however, are controlled by §3553(a)'s mandate to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

Numerous appellate decisions from various circuit courts have clarified the role and approach of the sentencing court in the post-Booker era. The Ninth Circuit has held that "Booker empowered district courts, not appellate courts....[and] breathe[d] life into the authority of district court judges to engage in individualized sentencing," United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted). The Ninth Circuit has also determined that in weighing the sentencing decisions of a district court, the proper standard is abuse of discretion, and it will not "second guess" the court's conclusions so long as they are reasonable. United States v. Menyweather, 447 F.3d 625, 633 (9th Cir. 2006).

Further, the Seventh Circuit has stated that post-Rita "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a guideline sentence." United States. v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).

## IV.

## DEFENDANT'S SOCIAL HISTORY

## SUPPORTS THE REQUESTED SENTENCE

In Gall v. United States, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Gall at 596-597.

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" Pepper v. United States, 562 U.S. 476 (2011), quoting Koon v. United States, 518 U.S. 81, 113 (1996). The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

In keeping with the above, the following social history information concerning Timothy (Tim) Ingram is presented.

A.  *General Information/Family Background*

Timothy Ingram was born on March 31, 1992 in Virginia Beach, Virginia. He is the only child of Schivette Hill, 47, and Timothy Ingram, Sr., 51. Tim's parents were never married and they separated when he was infant. Schivette raised him as a single mother, although until he was eighteen he spent time on weekends and during summers with his father and grandparents in Virginia Beach, where they still live. Tim's father has been a truck driver based in Virginia Beach for over 30 years.

Schivette Hill was born in Virginia Beach and now lives in Gastonia, North Carolina, minutes away from Charlotte. She joined the U.S. Air Force when she was 22 and spent eight years in the military working as a medic. While still in the service she earned a bachelor's degree in business administration and after she left the Air Force she earned an MBA from Saint Leo University in Florida. She now works as Support Coordinator for a company contracted with the Defense Department. Schivette is also working on a master's degree to become a marriage and family therapist and is currently doing an internship at Love and Acceptance, a counseling

and therapy practice in Huntersville, North Carolina. She sees 13 to 15 clients per week.

B.    *Childhood Upbringing*

Tim's mother joined the Air Force when he was five years old and from that point on he grew up on military bases until he finished eighth grade, mostly in Hampton, Virginia where he was close to family. Tim reports that his mother was very involved in all aspects of his upbringing. He had to be home before the streetlights came on and his mother regularly helped him with his homework. Tim was a talented athlete, especially in basketball. He started playing basketball at an early age and played all the way through high school, when he was his team's starting point guard. Tim's mother reports that the only reason he did not play in college was because his grades were not good enough.

Cheryl Bullard is a Strategic Partner Manager with the Red Cross. She has been a friend of Tim's mother Schivette since Tim was in elementary school. In her attached letter, Ms. Bullard recalls:

> He was a "Yes ma'am, No Ma'am kind of kid and never once has he been disrespectful to me. Of course, as he got older, he got into sports. He began to play basketball and became really good at it. Schivette even became a coach, which made it even more fun to attend his games. He was a great team player and loved to win games. It was something he was good at and that was a great accomplishment for him. I was proud to watch play and cheer on the sideline.

Schivette was honorably discharged from the Air Force in 2005, the year before Tim entered high school. He spent half of his ninth grade year with his grandmother in Virginia Beach, then moved back in with his mother after she was settled in Charlotte.

*C.* *Education and Learning Difficulties/Substance Abuse*

Tim reports that his basketball skills made him popular with his classmates, as did being known as "class clown."  This trait was probably connected to his early onset ADHD; Tim was diagnosed with ADHD when he was in elementary school.  In her letter to the Court, Schivette Hill recounts:

> Around the second grade, his teacher suggested he see a
> child psychologist as he had difficulty comprehending the
> materials and couldn't stay in his seat.  I followed their
> recommendation and he had weekly sessions with a child
> psychologist, and she diagnosed him with attention deficit
> hyperactivity disorder (ADHD) and started him on Ritalin.
> The meds were changed several times until they found the
> right medication and dose.  He continued medication until
> he graduated high school.  He was enrolled in the
> individual education resource program until he graduated
> high school which allowed him extra time to complete
> homework and additional time to take tests and quizzes.
> He was able to participate in a school camp at Norfolk
> State University on several occasions as his grandmother
> works there.  This also helped him improve academically.

Tim's grandmother Valencia Ingram earned an Ed.D. and has worked in higher education for two decades.  She writes:

> During his childhood, I exposed Timothy to several
> educational opportunities.  Timothy was raised by his
> mother, a strong, educated woman who served her country
> in the U.S. Air Force when Timothy was five years old.  I
> watched as she instilled in him discipline, honor, and
> respect.  Timothy struggled a little in school due to his

disability with ADHD, but that did not stop him from
doing the things he enjoyed most: playing basketball,
writing poetry, and rapping.

Ms. Ingram added in an interview:

I never had any trouble with Tim except to tell him to stop
running. He was having trouble in high school and came to
live with me for a semester. Working with him I saw
firsthand what it was like for a kid with ADHD. I believe
that was one of the major problems he had with school.

Despite his difficulties Tim graduated high school on time in June 2011 and
then took classes at Central Piedmont College in Charlotte for three semesters.
Felicia Morings, who was Tim's high school principal at Kennedy Charter School in
Charlotte, observes in her letter:

I had the pleasure of presenting him with his High School
Diploma. I was absolutely shocked and devastated to hear
about the charges…

I met Timothy in 2010 when he was transferring to our
school… While he had a learning disability, Timothy was
always on-time, prepared for class and instrumental in our
student body success.

Timothy always had a smile and a great personality to
match. He had a special connection with one of our
English teachers. You could always find him in his
classroom preparing for other classes, discussing current
events, or listening to music. This particular teacher loved
rap music as did Timothy. It was very common to walk in

on a rap session. Timothy used his love for music to help
him connect with others. Timothy is a phenomenal rap
artist. He was also a great basketball player. He helped
lead our team to a state final. He was loved by his
teammates, peers and teachers.

Unfortunately, like many young people with ADHD, Tim developed a substance use disorder beginning in his teen years.[6] He experimented with marijuana and was soon smoking every day or every other day, a pattern that continued until the day of his arrest. Tim drank alcohol as well, preferring tequila, and estimates he spent up to a couple of hundred dollars per week mostly on marijuana but also alcohol. He also took non-prescribed Xanax routinely, which he felt at the time helped alleviate his depression. In addition, he was regularly using hallucinogenic mushrooms and a street drug known as "lean," a combination of cough syrup containing promethazine (an antihistamine) and codeine, mixed with carbonated soda and pieces of hard candy. Tim first used "lean" when he was just out of high school and continued to use it when available until his arrest.

Tim has never participated in any type of substance abuse program and admits he needs help to deal with his history of drug and alcohol dependency and to explore the psychological roots of his substance abuse. The PSR notes:

INGRAM is encouraged to participate in the RDAP
program, along with any self-help support deemed
appropriate.[7]

---

[6] "Compared to their non-ADHD peers, adolescents with ADHD have more disturbances in social relations and academic underachievement despite adequate intellectual abilities. ADHD is also frequently associated with co-occurring learning and psychiatric problems across the lifespan. Likewise, substance use disorders (SUD) remain among the most problematic co-occurring disorders with ADHD." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4414493.

[7] PSR, ¶108.

D. *Employment History*

Tim's employment history is modest as he set his sights on getting into the music business early on. As far as standard employment goes, in high school he worked for two summers at an amusement park in Charlotte taking photographs of visitors. His next job was a season as a concession worker at Charlotte Bobcats (now Hornets) NBA games. A perk of this job was that Tim would see games for free whenever he was not working. Beginning in 2012, Tim worked for one year in sales at a Levi's outlet in a Charlotte shopping mall. The following year he worked loading trucks at a FedEx warehouse.

For several years before his arrest a year ago, Tim worked exclusively on getting his foot in the door in the music business. His efforts began when he was still in North Carolina and living with his mother. Like any conscientious parent, his mother Schivette has been agonizing over what she might have done differently and in conversation with counsel she has wondered aloud whether she was too lenient with Tim, particularly in the years after he finished high school and seemed to be "treading water" rather than taking positive steps to find gainful employment, even as she encouraged him in his plans to make it in the music business.

Tim moved to California in 2018 and as the PSR notes, he quickly became mired in debt owed to his record label.[8] It was in this context, exacerbated by his continued and increasing substance abuse and his naivete, that Tim became involved in the instant offense. This observation is in no way offered to excuse his behavior, but is submitted as a mitigating factor.

## V.

## THE DEFENDANT HAS A VIABLE AND ROBUST POST-RELEASE PLAN

Undersigned counsel has consulted extensively with Tim's mother Schivette Hill and others to come up with a solid and feasible plan for what he can do after he serves his sentence. The most important part of this plan is that he return home to

---

[8] PSR, ¶84.

15

his family.  Tim would be able to live with his mother in North Carolina primarily, but he will also have support from his father, grandmother and other relatives in neighboring Virginia, and with relatives of his mother in North Carolina.  The PSR recommends:

> Notably, while INGRAM may desire residence in Los Angeles, immediately following his release, he may be better served residing with family members.  Again, in addition to a strong support system, the defendant's potential success relies on his ability to stay clean and sober.  His efforts to do so will require treatment and support.[9]

Components of the proposed post-release plan are as follows:

- **Employment**

  Tim's childhood friend Nick Davis, who wrote one of the attached letters, works as a District Manager for Food Lion, a grocery store chain that operates 1,100 supermarkets in ten states in the Mid-Atlantic and Southeastern United States.  Nick has indicated he would be willing to help Tim secure employment at Food Lion.  While the chain has no formal stated policy regarding the hiring of ex-felons, according to Mr. Davis it has done so in the past. **Rehab and Therapy/Counseling**

  As noted above, Tim's mother Schivette Hill is an intern at Love and Acceptance, a counseling and therapy practice.  She has spoken with her supervisor about Tim and is assured there will be no impediment to him attending sessions with staff therapists.[10]  In addition, Phoenix Counseling Center -- which has for years operated a drug diversion

---

[9] PSR, ¶108.

[10] Schivette will have finished her internship by the time Tim is released and anticipates working elsewhere afterward, so there will be no conflict issues if Tim attends sessions at Love and Acceptance.

program for the Gaston County, North Carolina courts -- has a crisis and recovery center as well as administrative offices in Gastonia, the Gaston county seat where Tim's mother resides.

- **Community Service/Job Training**

  T'la Gardner is Tim's cousin on his mother's side. T'la lives in Gastonia and is working on a master's degree in social work. One of her current projects is developing a reentry program for people recently released from prison. T'la regularly volunteers with a group that cooks and delivers food for the homeless in the area, and she is familiar with most of the volunteer opportunities and job skills programs in Gastonia. She could help Tim find organizations that would be a good fit and she would readily give him a recommendation.

## VI.

## COMMUNITY SUPPORT

Numerous letters of support have been received from Tim's family and friends. These letters attest to his dedication to his family and his deep remorse for what he put them and the victims and their families through. All of the letters are attached, and some are excerpted below:

Tim's mother Schivette Hill states:

> This is heartbreaking all around. I hate that my son ever got involved in this situation and my heart and prayers goes out to the victims as this should never have happened to them. I recently lost my grandmother in November which was his great grandmother, and he couldn't attend her funeral which was heartbreaking for him as he loved her dearly. He has one great grandmother living who he cherishes. He made a horrible mistake. I cry often over this situation as my heart goes out to all those affected.

Childhood friend and prospective employer Nick Davis offers in his letter:

> Tim knows what he has done and is ashamed and depressed with his actions and is trying to make amends the most he possibly can. He has positive goals for his future and is going to make this situation better himself entirely to become a productive member of society and one day a loving and caring father. Tim is extremely remorseful for what he has done and the impact that it has had on the parties affected.

Tim's grandmother Valencia Ingram writes:

> Since his incarceration, Timothy has started showing signs of depression and has even talked about committing suicide. My husband and I have prayed with Timothy to keep these thoughts out of his mind. During our prayer sessions, he asked God and others affected for forgiveness. During our conversations, he continues to express remorse with his apologies.

Tim's uncle Phil Ingram, Jr. is an educator and football coach. He comments:

> Just a few years after graduating high school, Timothy decided to pursue his dream in the music industry and relocate to California. When he would come visit, he always asked to come help out at our football practices because he loved knowing about the next young talent coming out of our area. The joy on his face after seeing kids work hard at practice and watching their hard work turn to wins, gave me hope he understood what's important in life, giving back and building the next generation stronger.

Since his incarceration Timothy has not been the same. He is depressed and saddened of letting the family down that praised him so much. He's praying every day and night for forgiveness, and the remorse he has displayed lets me know he is taking the necessary steps to heal, because it all starts with accountability.

Cheryl Bullard, a longtime friend of Tim's mother, notes:

He was never a kid of many words, but I know that he knows he made a terrible mistake. This has mentally and emotionally broken his spirit, but his mom continues to pray for and with him every day. I am sad for him because this is not a situation that he has been in before and this has forever changed his life. This is heartbreaking for everyone involved and I pray for the families that were affected by his actions.

Tim's father Timothy Ingram, Sr. writes:

Growing up, Timothy was never a problem child. He was always respectful and courteous to anyone he met. In school, his teachers always commented on his mannerism and what a joy he was in the classroom. Timothy was always taught to respect and treat others the way he would want to be treated. When he decided to move to California, we were all so proud that he decided to make such a big move away from the guidance of his family. However, we knew that he had to spread his wings and follow his dreams.

Since his incarceration, Timothy has shown signs of depression, feeling sad all the time, feeling hopeless, and inability to concentrate.  During our phone conversations, Timothy has expressed on numerous occasions how remorseful he is and would ask God for forgiveness.  I pray this character letter regarding Timothy will contribute positively when Your Honor considers his sentencing.

## VII.

## CONCLUSION

Tim Ingram stands convicted of illegal behavior that is disturbing and unacceptable.  His family and friends were uniformly shocked to learn of the charges against him because there is nothing in his past, or in his character as they know it, to indicate that he would ever engage in this type of activity.  They are also unanimous in their belief that he will never again break the law.  Since he has been in custody over the past year, Tim has been "scared straight" and has pledged to live a sober and responsible life moving forward.

Tim profoundly regrets the behavior to which he has pled guilty.  Though he struggled with the panoply of problems that confront young people in our society -- including substance abuse and, in Tim's particular case, a learning disability -- he was well-liked in school by faculty and classmates alike, and was considered a young man whose potential would eventually rise to the surface.  Tim has been profoundly humbled by this experience and appears highly motivated to improve himself and to take advantage of the positive opportunities available to him back home in North Carolina.  He also recognizes that his criminal conduct is directly associated with his history of addiction and is fully cognizant that his substance abuse must be addressed through rigorous counseling, first through RDAP, and then through local resources following his release.

For the aforementioned reasons, Defendant Timothy Ingram, through counsel, respectfully requests that the Court impose a sentence of 60 months imprisonment, along whatever conditions of Supervised Release the Court deems appropriate, including drug and psychological counseling and extensive community service.  Such a sentence for this compliant and still maturing young man would be "sufficient, but not greater than necessary" to satisfy the sentencing factors set forth at 18 U.S.C. §3553(a).  It would punish the defendant, while at the same time recognizing his remorse and the mitigating circumstances that are present, and it would foster and encourage his personal rehabilitation process. which is already well underway.

Date:  August 24, 2022                    Respectfully submitted:

                                          LAW OFFICE OF
                                          CHRISTOPHER CHANEY

                              By      _/s/Christopher Chaney_____
                                          CHRISTOPHER CHANEY
                                          Attorney for Defendant
                                          TIMOTHY INGRAM